**Opinion issued May 29, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00336-CR

———————————

**JASON GUZMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 482nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1730717**

---

## MEMORANDUM OPINION

A jury convicted appellant Jason Guzman of indecency with a child by sexual contact. *See* TEX. PENAL CODE § 21.11(a)(1). Guzman pleaded true to one enhancement paragraph, and the jury assessed punishment of 40 years in prison and a fine of $10,100. *See* TEX. PENAL CODE § 21.11(d) (indecency with child by

sexual contact is second degree felony); *id.* § 12.42(b) (habitual offender statute elevates punishment to that of first-degree felony); *id.* § 12.32 (first-degree felony punishment). On appeal, Guzman raises two issues challenging the jury instructions and a third issue challenging the admission of testimony that he maintains was a comment on the complainant's credibility.

We affirm.

## Background

S.N.'s mother testified at trial that S.N., her fourth child, was born December 27, 2002. S.N.'s mother began dating Jason Guzman in 2016 after meeting him online. In November or December 2016, Guzman moved in with the mother and her five children, ranging in age from 13 to 18. They lived in a three-bedroom apartment in Pasadena, Harris County, Texas. At that time, the mother worked as a cashier in Baytown, and she sometimes returned home after 7:00 p.m. Because her siblings worked or had after-school activities, S.N. was often alone or with Guzman in the apartment after school.

When S.N. was 18 years old, and Guzman was no longer living with them, S.N. told her mother that Guzman had abused her when she was a child. Her mother recalled that S.N. was emotional but able convey some of what had happened. S.N.'s mother testified that soon after Guzman moved in, S.N. began running away for days at a time and smoking marijuana daily. Once, about a year

2

before Guzman moved in, S.N. went to a friend's house for several hours, but her mother did not consider that 'running away.'

S.N. identified Guzman in open court as her mother's former boyfriend, who had moved in with the family when S.N. was 13 years old. At first, S.N. recalled, Guzman was "the best." She said that he loved all of them "like his own," and engaged in fun family activities. But he was moody, could be "aggressive with everybody," and sometimes drank to intoxication.

Not long before her fourteenth birthday, S.N. was suspended from school for three days and home alone with Guzman, whom she trusted like a father. As she had done in the past, S.N. went to the bedroom Guzman shared with her mother to watch television with him. She was wearing pants, a shirt, underwear, and a bra when she lay down on the bed with Guzman. Guzman began fondling S.N.'s vagina over her clothes, then he removed her pants and underwear. S.N. testified that he did not say anything, he just "grabbed me and pinned me down." S.N. testified that she was "scared," and asked him to stop, but she did not recall the exact words she used. She testified that "[h]e put his penis inside my vagina." She "felt a lot of pain," "screamed," and thought, "help me." S.N. estimated that the encounter lasted at most 25 minutes, and she did not know what made him stop. She said that he had been wearing a white muscle shirt and black and gray shorts,

which he had removed. After the assault, Guzman threatened S.N. that he would kill her mother if she told anyone. S.N. said she "felt terrified."

S.N. said that she began running away for days or weeks after this assault because she "didn't feel safe" at home. But each time the police returned her to her mother. Still S.N. did not disclose the abuse; she said: "I didn't tell nobody because I felt threatened because he was threatening to be abusive. . . . [E]very time he did drugs or alcohol the more violent he got. . . . I seen the violent side of him . . . he's a very violent person. Aggressive."

S.N. testified that "roughly the same thing" happened again about three months after her fourteenth birthday. At the time she was wearing shorts and a tank top. She again went into the bedroom to watch television with Guzman. After she lay down on the bed, "[h]e pulled me closer to him and he did the same thing he did the first time." This time, however, instead of removing her shorts and underwear, he pulled them to the side before putting his penis inside her vagina. S.N. testified that it was painful, and she was terrified, but she did not recall other details because she "blacked out." After the assault, she "went inside [her] closet and cried."

When she was 14 years old, S.N. made a false report to Child Protective Services. S.N. falsely claimed that her mother had accused her of sleeping with Guzman. S.N. testified that she told this story to CPS after her mother angrily

4

"pinned [her] up against the wall because [she] was in bed with [Guzman]." But S.N. recanted to get the case dismissed so that her mother would not get in trouble. S.N. told her mom that she had called CPS because she felt like her mother had accused her of sleeping with Guzman. At trial, S.N. testified that her mother never verbally accused her of sleeping with Guzman.

Around age fifteen, S.N. began drinking alcohol and smoking marijuana with Guzman. S.N. testified that once when she was about 16 years old, she was napping on the couch when she was awakened by Guzman touching her "right where my stomach is at close to getting into my pants."

S.N. testified that she had a poor relationship with her mother throughout her teen years, and she attributed it to her mother's steadfast defense of Guzman. S.N. said: "She always believed him. He never did any wrong in her eyes." S.N. said her mother ended the relationship with Guzman in 2020. S.N. first told her mother about the sexual abuse when she was 18 years old. S.N. explained that her mother and Guzman maintained an on-again-off-again relationship, and she wanted her mother to stop going back to him. S.N. testified that her mother felt "very hurt" and "very guilty" when she learned of the assaults.

S.N. testified that she "never told a soul" before she confided in her mother about the assaults. On cross-examination, S.N. clarified that she understood the question to ask whether she said anything before she turned eighteen. S.N.

5

acknowledged that, before she spoke to the police in March 2021, she had told a cousin and her aunt's girlfriend about one of the incidents, but not "everything." S.N. denied having told police that both incidents of sexual abuse occurred in January 2017. S.N. maintained that Guzman first sexually abused her when she was 13 years old.

Pasadena Police Detective C. Brosar testified that he investigates cases involving the sexual abuse or exploitation of children. He testified that delayed outcries, in which the outcry is made days to years after the abuse, are fairly common in his line of work. Likewise, he agreed that discrepancies between an initial police report and later interview are also common.

Detective Brosar interviewed S.N. and her mother in March 2021, about a week after they first made a police report about Guzman. He testified that S.N. was "very emotional" during the interview, and that he even left the room to get her tissues. In particular, S.N. cried when she disclosed the first incident of sexual assault and when the detective showed her a photograph of Guzman. He said that she was certain about what happened and who assaulted her. S.N. identified Guzman by name, explained how she knew him, and provided details about how, where, and when the abuse occurred.

On cross-examination, Detective Brosar acknowledged that the initial police report indicated that there were two allegations of sexual assault that occurred in

6

January 2017. He said that the initial police report was based on information provided by S.N. and her mother, but he said: "I was given different information during the interview." Detective Brosar testified that S.N. told him the first assault occurred around November 2016 and the second was about two months later, after S.N. had turned 14 years old.

Detective Brosar said that S.N. told her mother about the assaults the same day that they made the initial police report. He also said that S.N. told her cousin and her aunt's girlfriend about the incident when Guzman put his hand under her waistband while she was napping but "not about the sexual assault."

Detective Brosar acknowledged the absence of physical evidence but explained that he would not expect physical evidence to be available in a case where the outcry was delayed by five years. He also said that it was common for a complainant's account to be inconsistent about exact dates due to the complainant's state of mind and the environment, such as speaking to a uniformed police officer in a police station as opposed to speaking to someone in plain clothes in a more relaxed setting. He also said: "[I]t's not common that a complainant, especially a child, remembers the exact date in which they were abused."

Dr. Whitney Crowson, a criminal psychologist at the Harris County Children's Assessment Center, testified at trial that she provides therapy and psychological services for child victims of sexual abuse. She described typical

childhood reactions to sexual abuse. She testified that often when an abuse victim says she "blacked out," she is describing disassociation, which can affect the victim's memory. "[T]o recall the details later from a moment when your mind goes elsewhere is very difficult, so sometimes we hear that they blacked out when really it was disassociat[ion]."

Dr. Crowson testified about childhood behavioral changes that may be indicative of sexual trauma, including defiance, running away, use of substances, or hypersexuality. On cross-examination, Dr. Crowson acknowledged that the behaviors she identified as typical reactions to childhood sexual abuse could also occur in the absence of sexual abuse.

Dr. Crowson testified that a child victim of sexual abuse will typically not make an outcry or disclosure unless she feels safe. Similarly, a child may delay making an outcry out of fear, shame, or uncertainty about how others will react. She said that a threat from a perpetrator could be a factor in delaying an outcry, especially when the victim has witnessed violence in the home, which "legitimizes the threat." Dr. Crowson testified that there are five typical stages in a disclosure of abuse, though not all five are present in all cases: "pre-disclosure, partial disclosure, delayed disclosure, recantation, and re-disclosure." In her work, Dr. Crowson had encountered "many" instances in which an adult disclosed childhood sexual abuse. She attributed this to the empowerment and independence that

8

increases with age, saying the likelihood of disclosure increases "because they won't be stuck in a house with someone they just told on and also underneath their power."

Dr. Crowson testified that a person testifying about sexual abuse could display a range of emotions from detachment to inconsolability, depending on her coping mechanisms, unconscious defense mechanisms, and whether she has healed from trauma. She explained how the person's emotions could impact memory or recall.

Dr. Crowson acknowledged that she had never met S.N. but testified about her impressions of S.N.'s recorded statement to the police. Over the defendant's running objection that the questions solicited an improper opinion on S.N.'s credibility, Crowson affirmed that S.N. was able to describe and detail what happened to her, identify where and when it happened, and provide the name of the perpetrator. Dr. Crowson described S.N.'s demeanor in the recorded police interview: nervous at first, more comfortable as the conversation progressed, and tearful when shown Guzman's picture.

In closing, the defense argued that the State's case depended entirely on S.N.'s testimony and that it was not "truthful and credible and of a high enough quality to convict someone of a serious felony offense." In particular, the defense argued that the inconsistencies in S.N.'s testimony, the initial police report, and the

9

detective's testimony about when the incidents occurred created reasonable doubt about whether a sexual assault occurred before S.N.'s fourteenth birthday. The defense also pointed out other inconsistencies: (1) S.N. saying she "never told a soul," but acknowledging that she told two relatives about part of the abuse; (2) S.N.'s testimony about which body parts Guzman touched; (3) S.N.'s mother's testimony that S.N. began running away after Guzman moved in, while also acknowledging that S.N. once left home for a few hours a year before Guzman moved in; (4) when S.N. first told her mother about the abuse; and (5) S.N.'s admission that she made a false CPS report when she was 14. Finally, the defense argued that the State used Dr. Crowson only to bolster its case.

The trial court submitted a charge to the jury on the offenses of aggravated sexual assault of a child and, at the State's request, the lesser-included offense of indecency with a child by contact. The jury convicted Guzman of the lesser-included offense of indecency with a child by sexual contact, a second-degree felony, and it assessed punishment of 40 years in prison and a fine of $10,100. Guzman appealed.

**Analysis**

**I.     The alleged errors in the jury charge were not egregiously harmful.[1]**

Guzman's first two issues challenge the jury charge. The first issue asserts that the trial court erred by failing to properly instruct the jury regarding the culpable mental state for indecency with a child. The second issue asserts that the charge failed to instruct the jury that it must reach a unanimous verdict as to which specific instance of indecency with a child by contact supported the charged offense. Guzman concedes that neither complaint was properly preserved, and he argues that these errors caused egregious harm. The State argues that even if the jury charge included these errors, Guzman has not shown egregious harm.

We review alleged jury charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). The degree of harm required for reversal depends on whether the jury charge error was preserved in the trial court. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth analysis for determining whether jury charge error requires reversal). If the jury charge error has not been

---

[1]     The jury acquitted Guzman of sexual assault of a child, and convicted him of the lesser included offense of indecency with a child by contact. *Green v. United States*, 355 U.S. 184, 190 (1957) (holding that defendant convicted of lesser included offense is impliedly acquitted of greater offense). Accordingly, we do not address Guzman's appellate arguments about the charge error regarding the sexual assault of a child offense.

properly preserved by an objection or request for instruction, reversal is required only if the appellant suffered "egregious harm" from the error. *Id.* Errors resulting in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Warner v. State*, 245 S.W.3d 458, 461–62 (Tex. Crim. App. 2008).

Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Wesley v. State*, 605 S.W.3d 909, 915 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Neither party has the burden to show harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In evaluating whether an error resulted in egregious harm, courts consider: (1) the jury charge; (2) the evidence; (3) the arguments of counsel; and (4) any other relevant information in the trial record. *Gelinas v. State*, 398 S.W.3d 703, 705–06 (Tex. Crim. App. 2013).

### A. The jury charge as a whole weighs against a finding of egregious harm.

Guzman first argues that the charge erroneously allowed the jury to convict him of indecency with a child without a proper instruction on the necessary mental state.

A person commits the offense of indecency with a child by contact if he "engages in sexual contact with [a] child" younger than seventeen years old. TEX. PENAL CODE § 21.11(a)(1). "Sexual contact" means "any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals

12

of a child," if the act is "committed with the intent to arouse or gratify the sexual desire of any person." *Id.* § 21.11(c)(1). Indecency with a child by contact in section 22.11(a)(1) is a conduct-oriented offense.[2] *Pizzo v. State*, 235 S.W.3d 711, 719 (Tex. Crim. App. 2007).

The abstract portion of the jury charge defined "intentionally" and "knowingly" in a manner consistent with a results-oriented or "result of conduct" offense rather than a conduct-oriented or "nature of conduct" offense. The charge stated:

---

[2]    The Court of Criminal Appeals has identified three general categories of criminal offenses:

> First, "result of conduct" offenses concern the product of certain conduct. For example, murder is a "result of conduct" offense because it punishes the intentional killing of another regardless of the specific manner (e.g., shooting, stabbing, suffocating) of causing the person's death. Thus, the death of one victim may result in only one murder conviction, regardless of how the actor accomplished the result. With the second category, "nature of conduct" offenses, it is the act or conduct that is punished, regardless of any result that might occur. The most common illustration of this second category is that of many sex offenses, where the act itself is the gravamen of the offense. Finally, "circumstances of conduct" offenses prohibit otherwise innocent behavior that becomes criminal only under specific circumstances. Unlawful discharge of a firearm is an example of this type of offense as it is the circumstances—the where, when, and how—under which a gun is fired that determines whether an offense was committed. A marksman is blameless if he fires his rifle at a target down a firing range, but if he turns around and shoots into the crowded parking lot, he has committed an offense.

*Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011) (cleaned up).

13

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The application paragraph pertaining to the lesser-included offense of indecency with a child, however, included the "nature of conduct" mens rea language found in the statute:

Therefore, if you find from the evidence beyond a reasonable doubt that on or about the 30th day of November, 2016, in Harris County, Texas, the defendant Jason Guzman, did then and there unlawfully engage in sexual contact with S.N., a child under the age of seventeen years, by touching the genitals of S.N. with the intent to arouse or gratify the sexual desire of the defendant, then you will find the defendant guilty of indecency with a child by contact.

"The application paragraph is what explains to the jury, in concrete terms, how to apply the law to the facts of the case." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013). "We look at the wording of the application paragraph to determine whether the jury was correctly instructed in accordance with the indictment and also what the jury likely relied upon in arriving at its verdict, which can help resolve a harm analysis." *Id.* "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999).

14

Guzman argues that the combination of the incorrect definition of intentionally in the abstract portion of the jury charge left the jury with no guidance on how to understand "intent" in the context of the application paragraph. We disagree. The application paragraph itself instructed the jury that it must find that Guzman had the intent to arouse or gratify his own sexual desire in order to convict him of indecency with a child by contact.

Guzman also argues that the jury charge erroneously permitted a non-unanimous verdict. He asserts that several portions of the jury charge permitted this. The charge stated:

> If you believe from the evidence beyond a reasonable doubt that a the defendant is guilty of either aggravated sexual assault of a child on the one hand or indecency with a child by contact on the other hand, but you have a reasonable doubt as to which of said offenses he is guilty, then you must resolve that doubt in the defendant's favor and find him guilty of the lesser offense of indecency with a child by contact.

An offense is a lesser included offense if it is included within the proof necessary to establish the offense charged. *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016). This part of the jury charge did not address different occurrences or instances of sexual assault or indecency with a child by conduct that were described by S.N.

The jury charge also stated that the State is not bound by the specific date of the offense, so long as it proved beyond a reasonable doubt that the alleged offense was committed at any time within the limitations period. Guzman argues that this

15

instruction "suggested to the jury" that it could convict if "each juror believed that at least one offense had been committed at any time." However, this argument ignores the application paragraph, which instructs the jury that it must find beyond a reasonable doubt that the offense was committed "on or about the 30th day of November, 2016." In addition, Guzman argues that the three references to unanimity communicated only that the jury must be unanimous on "guilty" or "not guilty." The first reference to unanimity occurs in the application paragraph for the offense of aggravated sexual assault of a child. The second reference to unanimity states that it is the foreperson's duty to certify the verdict when the jury has "unanimously agreed upon a verdict." The third reference to unanimity is at the end of the jury charge: "Your verdict must be by a unanimous vote of all members of the jury." Guzman argues that nothing in the charge required the jury to be unanimous regarding which of the three discrete incidents of sexual wrongdoing was committed.

The charge instructed the jury that it could consider evidence of extraneous offenses for limited purposes and only if the jury found beyond a reasonable doubt that Guzman committed the extraneous offense. The limited purposes included determining "the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any alleged . . . in the indictment," and determining Guzman's

16

and S.N.'s state of mind and their prior and subsequent relationship. In other words, the jury could not convict Guzman of the extraneous offenses, but it could consider the extraneous offenses for limited purposes in determining whether to convict him of the charged offense. The instructions did not authorize the jury to convict on the charged offense if the jury believed that Guzman was guilty of some other offense. These instructions informed the jury that it could not convict on the charged offense if it believed that Guzman was guilty of some other offense. Because the application paragraph for both aggravated sexual assault and indecency with a child by contact referred to on or about November 30, 2016, the earliest time S.N. asserted Guzman sexually assaulted her, any evidence regarding a later alleged sexual assault or sexual contact should only be regarded for limited purposes in accordance with the extraneous offense instructions.

The jury charge included an application paragraph that tracked the statutory language regarding intent. As a whole, despite the lack of an instruction requiring unanimity regarding the specific incident in order to convict, the jury charge focused the jury on the earliest alleged act of sexual contact with S.N. We conclude that the jury charge factor weighs against a finding of egregious harm.

**B.    The evidence weighs against a finding of egregious harm.**

Guzman argues that the state of the evidence weighs in favor of a finding of egregious harm because S.N. was not a credible witness. As he did in his closing

17

argument at trial, Guzman identifies discrepancies in the evidence about the date of the first alleged incident of sexual abuse and S.N.'s age at the time, when and to whom she disclosed the abuse, and the recanted CPS report she filed as a teen. Guzman also argues that Dr. Crowson's testimony was admitted solely to improperly bolster S.N.'s testimony, an argument that we reject in subpart II, below.

At trial, S.N. testified about three discrete incidents: two incidents in which she alleged that Guzman sexually assaulted her and one incident of unwanted touching. She said that the first incident occurred before her birthday, which her mother testified was at the end of December. S.N. testified that the second incident occurred several months after her birthday, and the third incident (unwanted touching) occurred years later. S.N. described the first incident with more detail than the others, saying that she "blacked out" the second time she was sexually abused. According to the detective, the initial police report was based on information provided by S.N., and the report indicated the first two incidents of sexual abuse occurred in January 2017.

The record also includes evidence to refute Guzman's argument about inconsistencies. For example, S.N. testified at trial about the dates of the first two incidents, and the detective testified that her answers to his investigative questions were consistent with her trial testimony, despite the earlier police report. Both the

18

detective and Dr. Crowson testified that survivors of sexual abuse do not commonly recall the exact dates on which the abuse occurred.

S.N. testified at trial that she "never told a soul" about Guzman's abuse. Later she said she had told two family members about "some" of what Guzman had done. The detective testified that S.N. told her family members only about the third incident of unwanted touching but not the earlier two incidents of sexual abuse.

As to the recanted CPS report, Dr. Crowson's testimony provided context that could help the jury resolve any inconsistencies. Dr. Crowson explained that child survivors of sexual abuse may be afraid of their abusers, especially if prior violence or aggression legitimized the threats. Dr. Crowson's testimony, in concert with S.N.'s testimony, supplied an explanation for the CPS report: S.N. was a child looking for a way out of an abusive situation.

The record demonstrates that although there are inconsistencies in S.N.'s testimony, there was other evidence from which the jury could reasonably conclude that she was credible. The evidence did not demonstrate that one of the three discrete incidents was more likely to have occurred than the others or supporting a specific defense as to one incident but not the others. Thus, the jury was likely either to find that S.N. was credible and that all three incidents occurred or to find that S.N. was not credible and that none of the incidents occurred. Based

on the evidence, it was unlikely the jury would be split on which incidents occurred.

In *Cosio v. State*, Jesus Cosio was charged with four separate sexual offenses, but the jury charge erroneously lacked an instruction requiring unanimity as to which incident satisfied each charge. 353 S.W.3d 766, 769–74 (Tex. Crim. App. 2011). The Court of Criminal Appeals determined Cosio was not egregiously harmed by this charge error because, as in our case, the evidence and arguments supported either a unanimous finding that all incidents occurred or a unanimous acquittal:

> Cosio's defense was that he did not commit any of the offenses and that there was reasonable doubt as to each of the four incidents because the C.P. was not credible and the practical circumstances surrounding the incidents of criminal conduct did not corroborate C.P.'s testimony. His defense was essentially of the same character and strength across the board. The jury was not persuaded that he did not commit the offenses or that there was any reasonable doubt. Had the jury believed otherwise, they would have acquitted Cosio on all counts. On this record, therefore, it is logical to suppose that the jury unanimously agreed that Cosio committed all of the separate instances of criminal conduct during each of the four incidents. It is thus highly likely that the jury's verdicts (on the three remaining counts not set aside on sufficiency grounds) were, in fact, unanimous.

*Id.* at 777–78 (footnote omitted); *see also Taylor v. State*, 332 S.W.3d 483, 493 (Tex. Crim. App. 2011) ("The defensive theory was that no sexual abuse occurred at any time. It is unlikely that the jury believed that Appellant sexually assaulted

the victim before he turned 17 years old but not after. In this case, the jury either believed Appellant or believed the victim.").

The state of the evidence does not weigh in favor of finding egregious harm.

**C.**      **The arguments and defensive theories weigh against a finding of egregious harm.**

At trial, Guzman's sole defensive theory was that he did not sexually abuse S.N., whom he claimed was lying. We have addressed the arguments about S.N.'s credibility in section I.B. above, in regard to the state of the evidence, and in section II.C., below, in regard to why Dr. Crowson's testimony was helpful to the jury. Guzman also argues that the State's closing argument mentioned that the jury could convict on indecency with a child by contact if it found S.N. to be credible but had a reasonable doubt about whether she was 13 years old at the time of the first incident of sexual abuse. We have already addressed this in regard to the jury charge in section I.A., above, in response to Guzman's assertion that the charge permitted a nonunanimous verdict.

The State argues on appeal that Guzman was not harmed by the lack of a proper instruction or definition of "intentionally" because intent was not relevant to Guzman's sole defensive theory. Guzman did not contend that he touched S.N. for a legitimate, noncriminal reason. *Cf. Evans v. State*, 299 S.W.3d 138, 142 (Tex. Crim. App. 2009) (requirement that indecency with child be accomplished with "intent to arouse or gratify the sexual desire of any person," excludes from

21

prosecution legitimate noncriminal contact, such as "a mother washing or bathing her own child"). Nothing in Guzman's counsel's argument served to potentially divide the jury relative to which of the three incidents they believed occurred.

The State's closing argument spans eight pages and 197 lines in the reporter's record. The State mentioned the second assault three times, in about 20 lines.[3] But the State also made it clear that it was seeking a conviction based on the first incident only. The State began its argument by reviewing the elements that it had the burden to prove: "The first thing that we have to prove is that on or about a certain day, which was November 30th, 2016—you heard both from the mother . . . and from the victim [S.N.], that that was around the day of the first assault." Next, in arguing about S.N.'s demeanor while testifying, the State said: "[I]magine being on the stand, testifying about your first ever sexual experience, which we asked you to think about on Friday when you were in here for the voir dire process." The State continued, again mentioning 2016 and mentioning S.N.'s age at that time: "All the testimony that you heard today points to one conclusion in this case, that

---

[3]   First, the State said that it had the burden to prove that Guzman "caused his sexual organ to contact the sexual organ" of S.N. The State then referred to two assaults, saying: "You heard from [S.N.] exactly what happened in both of those instances." Second, the State summarized S.N.'s testimony about the second assault, noting that she was able to distinguish a few details from the first assault and that she said she "blacked out." The State argued that this was evidence of her credibility. Third, the State referred to the second assault when arguing that S.N. had nothing to gain by lying because she was now an adult and Guzman was no longer in the family. The State argued: "She wanted people to hear her words of what this man did to her back in 2016 and 2017."

22

on November 30th or around that date, the defendant sexually assaulted [S.N.] by inserting his penis inside her vagina, and that she was under the age of 14 when he did it." Finally, the State concluded by again arguing that S.N. was 13 years old at the time of the offense for which it sought a guilty verdict:

> I'm going to ask that when you go back there you think of not the [S.N.] that you saw today but of the 13-year-old [S.N.], who was the victim of the defendant, had her innocence stolen away from her, and was made to grow up in a household that was not safe for her, didn't have a way out, tried to find different ways out, and eventually just gave up and settled into her situation until finally she was able to move out as she grew older.

The State's jury argument did not emphasize the second assault or the later sexual contact, and it did not encourage the jury render a nonunanimous verdict. To the contrary, the State's argument repeatedly informed the jury that it was seeking conviction for Guzman's actions during the first alleged instance of sexual abuse of S.N. We conclude that the arguments of counsel and defensive theories do not weigh in favor of finding egregious harm.

* * *

Reviewing the entire charge, the state of the evidence, the defensive theory, and the closing arguments, we conclude that the alleged jury charge errors did not cause egregious harm. *See Almanza*, 686 S.W.2d at 171. Accordingly, we overrule Guzman's first and second issues.

23

**II.** **The trial court did not abuse its discretion by admitting Dr. Crowson's testimony.**

In his third issue, Guzman argues that the trial court abused its discretion by allowing Dr. Crowson to "testify to her irrelevant improper bolstering of the complainant's testimony." App. Br. 35. "We review a trial court's decision to admit evidence under an abuse of discretion standard." *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). A trial court abuses its discretion only when its decision lies outside the zone of reasonable disagreement. *Id.*

**A.** **In the trial court, the defense objected to improper expert testimony.**

In the trial court, Dr. Crowson testified at length without objection about general characteristics exhibited by child sexual abuse survivors, including those who disclose the abuse as adults. She also testified that, although she never met or spoke to S.N., she viewed the recorded statement to the police to "see if anything stood out." After Dr. Crowson testified that some of what S.N. said was "very revealing," the defense objected to the follow-up questions:

> Q.   Now, without saying what she said, was she able to describe what had happen to her?
>
> A.   Yes.
>
> DEFENSE COUNSEL:   Your Honor, I object. This question calls for an improper opinion on the credibility of a witness and invades the province of the jury.
>
> THE COURT:   Overruled.

24

Q. Was she able to provide details about what happened to her?

A. Yes.

Q Was she able to provide follow up or clarifying details, if she did?

DEFENSE COUNSEL: Your Honor, again, I object on the same basis. And may I have a running objection, please?

THE COURT: Overruled. And, yes, you may.

. . . .

Q. Did she name the –-was she able to name the perpetrator in her case?

A. Yes.

Q. Was she able to describe where the abuse occurred?

A. Yes.

Q. Was she able to describe when the abuse occurred?

A. Yes.

Q. And was she cooperative during the interview?

A. Yes.

Q. Can you describe for us the demeanor that you observed during that interview?

A. She was–-appeared to be nervous in the beginning. The more they continued to talk, she appeared to become more comfortable. And then towards the end when shown the photo of the person, she had a strong emotional reaction.

Q. Can you describe what emotional reaction that you observed?

25

**A.** She started crying and indicated that is who she was speaking about.

**B. Guzman's appellate issue fairly includes a challenge to the trial court's overruling of his objection at trial.**

The State argues that Guzman's third issue does not comport with his trial objection. We disagree. At trial Guzman objected that the State's questions sought an improper opinion on the credibility of a witness and invaded the province of the jury. This can be understood as an objection under Rule 702 or 704. On appeal, Guzman mentions "bolstering"[4] and quotes some language from *Cohn v. State*, 849 S.W.2d 817, 819–20 (Tex. Crim. App. 1993). While Guzman did not object to "bolstering" at trial, on appeal, he argues in part that Dr. Crowson's testimony should have been excluded because her expert opinion regarding S.N.'s disclosure in her police interview was not helpful to the jury. We thus conclude that the brief raised an issue of whether the trial court abused its discretion by overruling the objection made at trial. *See, e.g.*, TEX. R. APP P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

---

[4] "Bolstering" is evidence offered for the "sole purpose" of enhancing the credibility of a witness or source of evidence without substantively contributing to relevance. *Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (citing *Cohn v. State*, 849 S.W.2d 817, 819–20 (Tex. Crim. App. 1993) (quoting former version of Texas Rule of Evidence 401)).

26

**C. Dr. Crowson's testimony was properly admitted to help the jury understand the evidence and determine the facts in issue.**

Guzman's specific objection at trial was that the State's questions called for an improper opinion on the credibility of a witness and invaded the province of the jury. The State argues in the alternative that the issue was not preserved, the exclusion of evidence was not an abuse of discretion, and the error, if any, was harmless. While we disagree that the issue was waived, we agree with the State that the court did not abuse its discretion in admitting Dr. Crowson's testimony.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. "An opinion is not objectionable just because it embraces an ultimate issue." TEX. R. EVID. 704.

An expert may not testify that a particular witness or class of witness is truthful because this type of evidence is not helpful to the jury. *Yount v. State*, 872 S.W.2d 706, 709, 711 (Tex. Crim. App. 1993) (testimony about truthfulness of witness not helpful to jury because it decides issue *for* jury); *see Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (jury is sole judge of witness credibility). A qualified expert may, however, testify about the behaviors one would expect children who have been sexually abused to exhibit. *Cohn*, 849

S.W.2d at 818–19. Under *Cohn*, such testimony may be relevant and admissible even if the behavior at issue is merely consistent with sexual abuse rather than of a sort that would only be exhibited because of sexual abuse. *Frohne v. State*, 928 S.W.2d 570, 575 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd). This sort of behavioral testimony must be tied to the facts of the case either through the expert's own testimony or the testimony of other witnesses regarding the behavior exhibited by the child. *Tillman v. State*, 354 S.W.3d 425, 439–40 (Tex. Crim. App. 2011) (discussing *Cohn*). But the fit between the expert testimony and the facts of the case need not be perfect; it suffices if the child displayed some of the symptoms or behaviors discussed by the expert. *Williams v. State*, 895 S.W.2d 363, 365–66 (Tex. Crim. App. 1994) (discussing *Cohn*).

Here, the State did not ask Dr. Crowson whether S.N. or adult survivors of childhood sexual abuse are generally truthful. Instead, Dr. Crowson described common behaviors of sexual assault survivors, both as children and adults, providing context for S.N.'s adolescent actions. *See Cohn*, 849 S.W.2d at 818–19. She explained that delayed disclosures can stem from fear reinforced by an abuser's violence. Her testimony helped the jury to interpret S.N.'s history of running away, marijuana use, and disrespectful behavior, and to consider whether S.N.'s recanted CPS report reflected dishonesty or trauma. *See* TEX. R. EVID. 702.

Dr. Crowson also testified about S.N.'s demeanor during her recorded police interview, tying her general testimony about common behaviors of sexual assault survivors to this case. *See Tillman*, 354 S.W.3d at 439–40. The jury could have relied on Dr. Crowson's testimony—that independence in adulthood may empower survivors to disclose childhood abuse—with her observations of S.N.'s demeanor during the interview—that her nervousness lessened as she spoke, and that she became emotional when shown Guzman's picture—to attribute S.N.'s recanted CPS report to trauma while finding her delayed disclosure credible. Because Dr. Crowson's testimony assisted the jury in understanding the issues and making its own credibility determination, we conclude that it was a proper topic of expert testimony in this case.

We conclude that the trial court did not abuse its discretion by admitting this evidence. We overrule this issue.

## Conclusion

We affirm the judgment of the trial court.

Susanna Dokupil
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).